# ONENAME CORPORATION

## TERM SHEET

## SECURED CONVERTIBLE DEBT OFFERING
### September 3, 2003

THIS TERM SHEET SUMMARIZES THE PRINCIPAL TERMS OF THE PROPOSED DEBT FINANCING (THE "OFFERING") FOR ONENAME CORPORATION, A WASHINGTON CORPORATION (THE "COMPANY").

THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY; THERE IS NO OBLIGATION ON THE PART OF EITHER NEGOTIATING PARTY UNTIL DEFINITIVE DOCUMENTATION IS SIGNED BY THE PARTIES; PROVIDED, HOWEVER, THAT EACH PERSON OR ENTITY THAT LENDS FUNDS TO THE COMPANY PURSUANT TO THIS TERM SHEET ("INVESTOR") SHALL SIGN THE ATTACHED ELECTION NOTICE INDICATING SUCH THE INVESTOR'S WILLINGNESS TO, IN GOOD FAITH, LEND FUNDS TO THE COMPANY UPON THE TERMS AND CONDITIONS DESCRIBED IN THIS TERM SHEET. IF THE INVESTOR DOES NOT SIGN THE ELECTION NOTICE, THE INVESTOR SHALL NOT BE ELIGIBLE TO MAKE THE LOAN WHEN APPROVED AND CLOSED UNDER THE TERMS SET FORTH HEREIN.

| | |
|---|---|
| OFFERING AMOUNT: | Not less than $1,500,000 ("Minimum Offering") but not more than $3,500,000 ("Maximum Offering"); provided, however, for purposes of determining a Minimum Offering or a Maximum Offering, the conversion of debt described below in the section entitled "CONVERSION OF EXISTING CONVERTIBLE DEBT AT INITIAL CLOSING" shall not be included, and the management concessions described below in the section entitled "MANAGEMENT STOCK FOR WAGE CONCESSIONS" shall be included. |
| PARTICIPATION: | Each investor ("Investor") must indicate their agreement to participate in the Offering by providing written notice of election to participate and stating the amount to be invested. A form of election notice is attached hereto as Exhibit B ("Election Notice"). Each Investor shall then pay the stated amount to be invested on or prior to the Initial Closing (as defined below in this Term Sheet). Such sum shall be deposited with the Company's bankruptcy counsel in its client trust account to be released to the Company in accordance with the terms provided below in the section entitled "ESCROW OF FUNDS." In the event that the bankruptcy plan is not approved by the Court (as defined below in the section entitled "CLOSING"), the Company shall curtail operations to a minimum and return funds to the Investors. |

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY.
DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

CLOSING:

The Company expects to file for Chapter 11 bankruptcy protection ("Bankruptcy Protection") on or about September 8, 2003. The initial closing of the Offering (the "Initial Closing") will be held immediately following final approval by the U.S. Bankruptcy Court (the "Court") of the Company's request for approval of financing. A final closing (the "Final Closing") will be held within 30 days of Initial Closing. The Initial Closing will be the last date upon which Existing Convertible Debtholders (as defined below) may convert their Existing Debt into the Notes at the most favorable pricing, as described below in the section entitled "CONVERSION OF EXISTING CONVERTIBLE DEBT AT INITIAL CLOSING".

DESCRIPTION OF NOTES:

Each Investor shall receive a Secured Convertible Promissory Note ("Note" or collectively "Notes") for the full amount loaned by the Investor. Upon the election of each Investor, the Investor's Note shall be converted into one (1) share of a newly created class of preferred stock of the Company ("New Preferred"), as further described in <u>Exhibit A</u> hereto, for each $0.81 invested.

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY. DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

MAXIMUM OFFERING:

In the event that the Company closes a Maximum Offering, the aggregate of the principal and interest on the Notes shall convert into shares of New Preferred representing no more than seventy-five percent (75%) of the issued and outstanding stock of the Company at the time of conversion on a fully diluted basis. Also, in the event that the Company receives binding commitments in an amount in excess of the Maximum Offering, each Existing Convertible Debtholder (as defined below) will be guaranteed conversion of all Existing Convertible Debt (as defined below) into Notes in this Offering, and furthermore, existing shareholders will be given preference over new investors in the allocation of available Notes

In the event that the Company closes an amount less than the Maximum Offering the Notes will convert into less than 75% of the Company stock. For example, if $1,000,000 of Existing Convertible Debt is obtained, those investors would receive Notes convertible into 1,234,568 shares for the new investment and 1,234,568 shares for the conversion of Existing Convertible Debt; furthermore if investors holding $1,000,000 in Existing Convertible Debt elected not to invest further funds but wished to convert their debt into the Notes, those Investors would receive Notes convertible into 246,914 shares; furthermore, if other Investors invested $500,000 they would receive Notes convertible into 617,284 shares for the new investment; furthermore if management conceded wages of $500,000 they would receive Notes convertible into 617,284 shares; in this example $2,000,000 in new cash value would be invested yielding Notes convertible into 65% of the company stock.

The number of New Preferred shares issued "NPS" = ((new cash invested) + (Existing Convertible Debt matched by new cash) + 0.2*(Existing Convertible Debt not matched by new cash) + (management wages conceded)) / (share price), where share price = $0.81. The percentage of the company that will be owned by the New Preferred = (NPS)/(NPS + New Common shares + New Options) = (NPS)/(NPS + 2,500,000).

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY.
DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

SECURITY INTEREST:
The Notes shall be secured by a first priority lien in all of the assets of the Company that are not subject to any pre existing, validly perfected security interest and a lien junior to any pre existing, validly perfected security interests in all other assets of the Company, except for those assets reserved for other creditors under the bankruptcy plan. The company intends to submit in its plan of reorganization to the Court that the only assets reserved to satisfy the claims for the secured and unsecured creditors are the proceeds from enforcement of the Company's currently owned patents.

The Investors who are presently holders of Existing Convertible Debt agree that such debt should hold a security interest junior to the Notes as a condition prior to converting their Existing Convertible Debt into the Notes.

ESCROW OF FUNDS:
The investment funds from the Offering shall be released to the Company subject to a performance-based escrow agreement as follows:

- $700,000 shall be immediately available to the Company for use in operations upon Court initial approval of the financing described in this Term Sheet.

- All subsequent funds shall be released upon the Company achieving pre-specified milestones pursuant to a plan approved by the Board of Directors (the "Board"), including:

  o OASIS committee approval of the XRI specifications;
  o Public release of server software by Epok Inc. or other similar vendors; and
  o Signing a strategic partnership agreement for a registry operator or equivalent.

BANKRUPTCY COURT AUTHORIZATION:
The sale and issuance of securities pursuant to the terms of the Offering shall be contingent upon the approval of the financing set forth in the Offering by the Court.

INTEREST RATE:
The Notes will bear interest at the rate of nine percent (9%). The Notes shall accrue interest from the date each respective Note is issued through and until the earlier of (a) repayment of the Note in full, including all principal and interest, or (b) conversion of the Note to equity in the Company as described in this Term Sheet. All Notes shall have the same maturity date.

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY.
DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

| | |
|---|---|
| MATURITY: | The Notes shall mature and all principal and accrued interest shall be due and payable on the earlier of: (a) three (3) years after the date of the issuance of each respective Note, (b) upon the occurrence of a Qualified IPO, Sale of Company, or liquidation and winding up of the Company, or (c) upon default under the terms of the Note. |
| THE BANKRUPTCY PLAN: | In connection with the filing for Chapter 11 bankruptcy protection, the Company will file and obtain Court approval for a bankruptcy plan of reorganization in accordance with the provisions of the Bankruptcy Code. The Company expects that the bankruptcy plan will restructure all of the Company's debts and capital structure. The Company also expects that all existing equity of the Company (common and preferred shares and warrants) will be converted into new shares with different classes and rights than the current shares, options, and warrants, and will address the antidilution rights of the current holders of Preferred Stock and warrants. |
| | The Company expects that all of the currently outstanding shares of the Company's stock (common and preferred shares and warrants), namely, 39,819,367 shares, will be converted into 1,500,000 shares of Common Stock, options, or warrants (See capitalization tables below). |
| CONVERSION OF EXISTING CONVERTIBLE DEBT AT INITIAL CLOSING: | Each holder ("Existing Convertible Debtholder") of an existing convertible secured debt instrument issued by the Company since May 2001 ("Existing Convertible Debt") shall have the right to convert the outstanding principal and accrued interest of such Existing Convertible Debt into a Note issued pursuant to this Offering. This conversion of Existing Convertible Debt is limited to the amount invested in this current debt offering, except for funds loaned in July 2003, which shall be converted without additional investment. Each holder shall ultimately have the right to convert the Note into one (1) share of New Preferred for each $0.81 of Existing Convertible Debt. The Notes issued pursuant to this conversion shall be excluded from the determination of whether a Minimum Offering or a Maximum Offering has been achieved. |
| | In the event that an Existing Convertible Debtholder does not participate in the Offering by loaning additional funds, such Existing Convertible Debtholder shall continue the right to convert the Existing Convertible Debt, but the conversion will instead be at a conversion price of one (1) share of New Preferred per $ 4.05 of Existing Debt. Such rights of conversion shall expire on Final Closing. |

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY.
DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

| | |
|---|---|
| MANAGEMENT STOCK FOR WAGE CONCESSIONS | The management team will receive one (1) share of New Preferred for each $0.81 of wage concession, subject to incremental vesting consistent with the company's deferred compensation plan. The shares of New Preferred issued pursuant to this section shall be included in the determination of whether a Minimum Offering or a Maximum Offering has been achieved. |
| ALLOCATION OF NEW SHARES TO OPTION PLAN | Upon approval of the bankruptcy plan by the Court, the Company expects to cancel and terminate all currently outstanding options to purchase capital stock of the Company, as they are presently "underwater" and of no value. Then, on or shortly after the Final Closing, 1,000,000 shares of Common Stock shall be allocated to the Company's incentive stock option plan for issuance to employees, representing ten percent (10%) of the issued and outstanding stock of the Company after the Offering. |

CAPITALIZATION AS OF JULY 30, 2003:

| | |
|---|---|
| Common Stock: | 13,094,027 shares |
| Series A Preferred: | 5,000,000 shares |
| Series B Preferred: | 1,000,000 shares |
| Series C Preferred: | 666,666 shares |
| Series D Preferred: | 4,662,474 shares |
| Series E Preferred: | 15,396,200 shares |
| **Total:** | **39, 819,367 shares** |

| | |
|---|---|
| Options and Warrants issued and outstanding: | |
| Options | 5,471,399 |
| Common Warrants | 250,000 |
| Series E Warrants | 1,680,260 |

CAPITALIZATION POST FINAL CLOSING:

| | |
|---|---|
| Common Stock: | (15%) 1,500,000 shares |
| (Representing all shares and warrants described above in July 30 capitalization) | |
| Employee Option Pool: | (10%) 1,000,000 shares |
| New Preferred: | (75%) 7,500,000 shares |
| (Assumes Maximum Offering and full exercise of conversion rights and includes 616,976 shares issuable to management) | |
| **Total:** | **(100%) 10,000,000 shares** |

**THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY. DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.**

| | |
|---|---|
| RESTRICTIONS: | The securities have not been registered under the Act, are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available. |
| INVESTOR QUALIFICATIONS: | The notes are only being offered to "accredited investors" as that term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Act"). |
| LOAN COVENANTS: | Each of the following actions shall require the approval of at least a majority of the Investors based upon the original principal balance of their Notes, which consent may be granted or withheld in their sole discretion, and the occurrence of any of the following actions without such consent shall constitute an event of Default |

- Any loan made by the Company, including any loans to insiders.
- Any debt incurred, except routine trade debt incurred in the normal course of business.
- The offer, sale, or issuance by Company of any class or series of debt or equity securities, or the issuance by Company of any warrants, options or other rights for securities, except for those provided for herein.
- The payment by the Company of any dividends or distributions to shareholders.

The following do not require the consent of the Investors as described above, but shall be considered events of Default, unless waived by at least a majority of the Investors based upon the original principal of their Notes:

- The sale or transfer of any secured assets.
- A merger or liquidation of the Company.
- The dismissal or conversion of the Chapter 11 proceeding before the Court.
- The failure of the Company to achieve the milestones specified in the section entitled "ESCROW OF FUNDS" or as otherwise specified by the Board.

In the event of Default, any remaining funds held by the Company will be returned to the Investors and there will be no further obligation to fund operations.

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY.
DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

**ONENAME CORPORATION**

**NEW PREFERRED SHARES**

In connection with the issuance of Secured Convertible Debt as outlined in the attached Term Sheet, the Company has provided for the conversion of such debt into shares of New Preferred under certain terms and conditions. Such shares of New Preferred will have the following characteristics:

CONVERSION:

Each share of New Preferred will be convertible into one (1) share of Common Stock (subject to antidilution adjustment) at any time at the option of the holder. All shares of New Preferred automatically convert into Common Stock upon: (1) consummation of underwritten public offering with aggregate proceeds in excess of $10,000,000 and at a per share price of at least $5.00 (a "Qualified IPO"); (2) sale of the company or substantially all of its assets (a "Sale of Company"); or (3) the affirmative vote of a majority of the shares of New Preferred.

ANTI-DILUTION PROVISIONS:

The conversion ratio of the New Preferred will be one (1) share of New Preferred to one (1) share of Common Stock, subject to adjustment in accordance with a standard, weighted average, anti-dilution formula in the event the Company issues certain equity securities at a purchase price less than the conversion price, subject to typical carveouts. The conversion price of the New Preferred will also be subject to proportional anti-dilution adjustment for stock splits, stock dividends, and the like.

LIQUIDATION PREFERENCE:

In the event of a Qualified IPO, a Sale of Company, or any liquidation or winding up of the Company, the holders of New Preferred will be entitled to receive, in preference to the holders of Common Stock, an amount equal to their Original Purchase Price, which shall be the price at which the Investor converted the Investor's Note into New Preferred ($0.81 per share). After payment in full of the liquidation preference described in the previous sentence, the holders of the New Preferred and the Common Stock shall share pro rata in the remaining assets of the Company.

VOTING RIGHTS:

A holder of New Preferred shall be entitled to that number of votes on all matters presented to stockholders equal to the number of shares of Common Stock into which the New Preferred is convertible.

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY. DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

PROTECTIVE PROVISIONS:    Without the approval of the holders of at least a majority of the outstanding New Preferred, the Company will not take any action that (i) effects a sale of all or substantially all of the Company's assets or which results in the holders of the Company's capital stock prior to the transaction owning less than fifty percent (50%) of the voting power of the Company's capital stock after the transaction. The Company will deliver to each holder of New Preferred, its annual and quarterly financial statements. The obligation of the Company to furnish such information will terminate at such time as the Company consummates an IPO or becomes subject to the reporting provisions of the Securities Exchange Act of 1934.

REGISTRATION RIGHTS    The holders of New Preferred shall receive registration rights, tag-along rights and drag-along rights upon terms and conditions acceptable to the holders of more than fifty percent (50%) of the then aggregate principal of the Notes.

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY.
DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

<u>**EXHIBIT B**</u>

**ONENAME CORPORATION**

**ELECTION NOTICE**

**September 3, 2003**

Please fill in the following information:

**Name of Investor**: _____
**Address**: _____
_____
_____
**Telephone**: _____
**Facsimile**: _____
**Email**: _____

**ELECTION TO PARTICIPATE IN OFFERING**

Please check one of the boxes in the following sentence:

Assuming that the issuance of Secured Convertible Promissory Notes, New Preferred stock and warrants, as outlined in the Term Sheet (the "*__Offering__*") is approved by the Bankruptcy Court, I/we:

❑　　　　Elect to participate and, if currently a holder of Existing Convertible Debt, agree to subordinate said debt to the Notes as a condition prior to converting said debt into the Notes.

❑　　　　Do not elect to participate in the Offering.

If I/we elect to participate in the Offering, I confirm to you that I am a qualified investor.

I/We will invest the following amount: $_____

Date of Signature: September _____, 2003

_____
Signature of Investor

_____
Printed Name of Signor

_____
Title, if any, of Signor

**NEITHER THE COMPANY NOR ANY INVESTOR SHALL HAVE ANY OBLIGATION TO ISSUE, SELL OR PURCHASE SECURITIES UNTIL DEFINITIVE DOCUMENTATION OF SUCH SALE HAS BEEN EXECUTED AND DELIVERED BY BOTH PARTIES.**

**PLEASE RETURN THIS DOCUMENT AS SOON AS POSSIBLE, BUT PREFERABLY NO LATER THAN *SEPTEMBER 3, 2003*, VIA FAX, AND EITHER MAIL OR PERSONAL DELIVERY TO: ONENAME CORPORATION, ATTENTION: LON WIESE, 21408 SE 33RD PLACE, SAMMAMISH, WASHINGTON 98075, FAX: (425) 837-3815; WITH A COPY TO WHITE & LEE LLP, ATTENTION: WALLACE A. GLAUSI AND ERNEST G. BOOTSMA, 805 SW BROADWAY, SUITE 2440, PORTLAND, OREGON 97205, FAX: 503-419-3001.**

THE INFORMATION CONTAINED IS HIGHLY CONFIDENTIAL AND PROPRIETARY.
DO NOT DISTRIBUTE, COPY OR DISCLOSE THE CONTENTS OF THIS DOCUMENT.

## ONENAME CORPORATION

## DEBT CONVERSION AND MATCHED NEW INVESTOR

The undersigned is an Existing Convertible Debtholder (as such term is defined in that certain Term Sheet dated September 3, 2003 (the "*Term Sheet*")) of ONENAME CORPORATION, a Washington corporation (the "*Company*").  The undersigned wishes to convert all or a portion of the undersigned's Existing Convertible Debt (as defined in the Term Sheet) into a newly issued secured convertible note as described in the Term Sheet.  Such conversion is limited to the amount of the undersigned's new investment under the terms of the Term Sheet; provided, however, an Existing Convertible Debtholder may match such debtholder's conversion with the new investment of a third party.  The undersigned represents that the undersigned wishes to convert the amount of the Existing Convertible Debt set forth below, and the undersigned represents that the name, address, telephone number and amount of investment of a new investor set forth below is matched with the undersigned's conversion:

1.    Name of Existing Convertible Debtholder:_____
_____

2.    Amount Existing Convertible Debtholder will Convert:_____

3.    Amount Existing Convertible Debtholder will Invest:_____

4.    Name of Matched New Investor:_____
_____

5.    Address and Telephone Number of Matched New Investor:_____
_____
_____
_____

6.    Amount that Matched New Investor will Invest:_____

Dated: _____, 2003

_____
Signature of Existing Convertible Debtholder

_____
Name of Existing Convertible Debtholder

_____
Signature of Matched New Investor

_____
Name of Matched New Investor

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "*Agreement*") is made and entered into effective as of August ____, 2003, by **ONENAME CORPORATION**, a Washington corporation (the "*Company*"), in connection with that certain Term Sheet dated effective as of August 21, 2003 (the "*Term Sheet*"), for the benefit of each person or entity (collectively with such persons' or entities' successors and assigns, the "*Investors*") that is issued or becomes the holder of one or more of a series of secured convertible notes (collectively the "*Convertible Notes*") issued by the Company that reference the Term Sheet and this Security Agreement, and for the benefit of _____, the collateral agent selected by the Investors and appointed to protect their interests (in such capacity, "*Agent*").

## AGREEMENT:

1. **Definitions**. The definitions "*Account*," "*Chattel Paper*," "*Deposit Account*," "*Document*," "*Electronic Chattel Paper*," "*Equipment*," "*Financial Assets*," "*General Intangible*," "*Goods*," "*Instrument*," "*Inventory*," "*Investment Property*," "*Letter of Credit Rights*," "*Payment Intangible*" and "*Supporting Obligation*," shall have the meanings defined in the Uniform Commercial Code as enacted in Washington, as amended from time to time. When used in this Agreement, the following terms shall have the following meanings:

1.1 "*Account Debtor*" means the party who is obligated on or under any Account, Chattel Paper or General Intangible.

1.2 "*Collateral*" means all property, real, personal and mixed, tangible and intangible, wherever located, now owned or hereafter acquired by Company, or in which Company has or later obtains an interest, and all products, profits, rents and proceeds of such property, including but not limited to Accounts, Chattel Paper (including Electronic Chattel Paper), Deposit Accounts, Documents, Equipment, Financial Assets, General Intangibles (including Payment Intangibles), Goods, Health-Care-Insurance Receivables, Instruments, Inventory, Investment Property, Letter of Credit Rights, Supporting Obligations, Patents, Copyrights and Trademarks, all claims for tax refund, whether now existing or hereafter arising, of Company against any city, county, state or federal government or any agency or authority or other subdivision thereof, and the proceeds thereof and all of Company's drawings, designs, blueprints and sketches, used or usable in connection with Company's business; all customer lists, ledger and account cards, computer tapes, discs and printouts, and books and records of Company; and any and all other properties and assets of Company of whatever nature, tangible or intangible, wherever located and whether now or hereafter existing.

1.3 "*Copyrights*" means any copyrights, rights and interests in copyrights, works protectable by copyrights, copyright registrations and copyright applications, including, without limitation, the copyright registrations and the applications listed on Schedule I attached hereto, and all renewals of any of the foregoing, all income, royalties, damages and payments now

and hereafter due and/or payable under or with respect to any of the foregoing, including, without limitation, damages and payments for past, present and future infringements of any of the foregoing and the right to sue for past, present and future infringements of any of the foregoing.

1.4 "***Event of Default***" means an occurrence of an Event of Default as defined in the Note.

1.5 "***Patents***" means any patents and patent applications, including, without limitation, the inventions and improvements described and claimed therein, all patentable inventions and those patents and patent applications listed on Schedule II attached hereto, and the reissues, divisions, continuations, renewals, extensions and continuations-in-part of any of the foregoing, and all income, royalties, damages and payments now or hereafter due and/or payable under or with respect to any of the foregoing, including, without limitation, damages and payments for past, present and future infringements of any of the foregoing and the right to sue for past, present and future infringements of any of the foregoing.

1.6 "***Secured Obligations***" means all obligations and liabilities of every nature of Company now or hereafter existing under or arising out of or in connection with the Notes and/or the Purchase Agreement, whether for principal, interest (including without limitation interest that, but for the filing of a petition in bankruptcy with respect to Company, would accrue on such obligations), liquidation amounts, fees, expenses, indemnities or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owned with others, and whether or not from time to time decreased or extinguished and later increased, created, or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Agent or the Investors as a preference, fraudulent transfer, or otherwise, all attorneys' fees and other costs and expenses incurred by Agent and/or Investors in connection with the enforcement of the rights and remedies reserved in the Notes, the Purchase Agreement and this Agreement, through all appeals, and all obligations of every nature of Company now or hereafter existing under this Agreement.

1.7 "***Trademark***" means (a) any trademark, trade name, corporate name, company name, business name, fictitious business name, trade style, service mark, logo or other source or business identifier, including, without limitation, any of the aforementioned items referred to in Schedule III attached hereto, and the goodwill associated therewith, now existing or hereafter adopted or acquired, any registration or recording thereof, and any application in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States or of any state thereof or any other country or any political subdivision thereof, or otherwise, and (b) all renewals thereof.

2. **Grant of Security Interest**. As security for the payment and satisfaction of the Secured Obligations, Company hereby grants to Agent, for the benefit of the Investors, a continuing security interest in and assigns to Agent all of Company's right, title and interest in the Collateral and all products, profits, rents and proceeds thereof.

3. **Covenants of Company**. Company shall fully perform each of the covenants set forth below.

3.1 **Obligations to Pay**. (a) Company shall pay to the Investors, as and when due and in full, all amounts payable by Company to the Investors, pursuant to the Notes; and(b) Company shall pay and reimburse Agent and the Investors for other Secured Obligations including reasonable attorneys' fees and legal expenses incurred in connection with the exercise by Agent or the Investors of any of their rights or remedies under this Agreement or the Notes.

3.2 **Performance**. Company shall fully perform in a timely fashion every covenant, agreement and obligation set forth in the Purchase Agreement, this Agreement and the Notes.

3.3 **Further Documentation**. Upon the written request of Agent, and at the sole expense of Company, Company will promptly execute and deliver such further instruments and documents and take such further actions as Agent may deem desirable to obtain the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, filing of any financing statement under the Uniform Commercial Code, execution of assignments of General Intangibles, delivery of appropriate stock or bond powers, transfer of Collateral (other than Inventory, Accounts and Equipment) to Agent's possession if necessary to perfect Agent's security interest therein. Company hereby authorizes Agent to file any such financing statements (including electronic or facsimile filings) on Company's behalf covering collateral described as "***all assets***" of Company, without the signature of Company to the extent permitted by applicable law, and to file a copy of this Agreement in lieu of a financing statement.

3.4 **Filing Fees**. Company shall pay to Agent all costs of filing this Agreement with the U.S. Patent and Trademark Office and any financing, continuation or termination statement with respect to the security interests granted herein.

3.5 **Maintenance of Records**. Company shall keep and maintain at its own cost and expense satisfactory and complete records of the Collateral including but not limited to a record of all payments received and all credits granted with respect to the Collateral and all other dealings with the Collateral. Company shall mark its books and records pertaining to the Collateral to evidence this Agreement and the security interests granted herein. Company shall deliver and turn over to Agent and the Investors all books and records pertaining to the Collateral at any time after the occurrence and during the continuation of an Event of Default, if so demanded by Agent or any Investor.

3.6 **Changes in Locations, Name, Etc**. Company will not (a) change its state of organization, (b) change the location of its chief executive office/chief place of business or remove its books and records from the location specified in this Agreement, (c) permit any of the Inventory or Equipment to be kept at locations other than those identified to Agent, or (d) change

its name, identity or structure to such an extent that any financing statement filed by Agent in connection with this Agreement would become ineffective or seriously misleading, unless it shall have given Agent at least 30 days' prior written notice thereof.

3.7    **Intellectual Property**.

(a)    Company (either itself or through licensees) will (i) continue to use each Trademark, on each and every trademark class of goods applicable to its current line as reflected in its current catalogs, brochures and price lists in order to maintain such Trademark in full force free from any claim of abandonment for nonuse, (ii) maintain as in the past the quality of products and services offered under such Trademark, (iii) employ such Trademark with the appropriate notice of registration, (iv) not adopt or use any mark that is confusingly similar to or a colorable imitation of such Trademark unless the Investors shall obtain a perfected security interest in such mark pursuant to this Agreement and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any Trademark may become invalidated.

(b)    Company will notify Agent immediately if it knows, or has reason to know, of (i) any application or registration relating to any Trademark, Copyright or Patent material to its business that may become abandoned or dedicated or (ii) any adverse determination or development (including but not limited to the institution of, or any adverse determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding Company's ownership of any material Trademark, Copyright or Patent or its right to register, keep or maintain the same.

(c)    Whenever Company, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any material Trademark, Copyright or Patent with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, Company shall report such filing to Agent within five business days after the last day of the calendar month in which such filing occurs. Company shall execute and deliver to Agent all agreements, instruments, powers of attorney, documents and papers that Agent may request to evidence Agent's security interest in any Trademark, Copyright or Patents and in the goodwill and general intangibles of Company relating to or represented by such Trademark, Copyright or Patent. Company hereby constitutes Agent its attorney-in-fact to execute and file all such writings for the foregoing purposes, including pursuant to Section 3.3, with all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, is irrevocable until all Secured Obligations are paid in full.

(d)    Company will take all reasonable and necessary steps, including but not limited to all reasonable and necessary steps in any proceeding before the United States Patent and Trademark Office, United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application, to obtain the relevant registration, and to maintain each registration of material Trademarks, Copyrights and

Patents, including but not limited to filing applications for renewal, affidavits of use and affidavits of incontestability.

(e)     If any Trademark, Copyright or Patent that is included in the Collateral is infringed, misappropriated or diluted by a third party, Company shall promptly notify Agent after it learns thereof and shall take such action as Company reasonably deems appropriate under the circumstances to protect such Trademark, Copyright or Patent.

3.8     **Insurance**.   Company agrees to maintain commercially reasonable insurance policies to insure the Collateral against all hazards.  If Company fails to obtain such insurance, Agent shall have the right, but not the obligation, to obtain either insurance covering both Company's and Agent's interest in the Collateral or insurance covering only Agent's interest in the Collateral.  Company agrees to pay any premium charged for such insurance.  Any unpaid insurance premium advanced by Agent shall be secured under the terms of this Agreement. Neither Agent nor the Investors will have any liability whatsoever for any loss which may occur by reason of the omission or lack of coverage of any such insurance.  Company hereby assigns to Agent the right to receive proceeds of such insurance to the full amount of the Secured Obligations and hereby directs any insurer to pay all proceeds directly to Agent, and authorizes Agent to endorse any draft.  In Agent's discretion, Agent may apply any insurance proceeds either toward repair of the property or reduction of the balance of the Secured Obligations.

3.9     **Disposition of Collateral**.  Except for sales of Inventory in the ordinary course of Company's business, or for the disposition of other immaterial assets owned by Company in the ordinary course, Company will not sell, assign, transfer or otherwise convey any of the Collateral.

3.10     **Taxes**.  Company will pay promptly before delinquent all property and other taxes, assessments, and governmental charges or levies imposed upon, and all claims (including claims for labor, materials, and supplies) against, the Collateral, and all income and other taxes imposed upon Company, except to the extent the validity thereof is being contested diligently and in good faith by proper proceedings by Company.

3.11     **Deposit Accounts**.  Company shall not open any new accounts unless Company shall have given Agent ten business days' prior written notice of its intent to open any such new accounts.  Company hereby authorizes the financial institutions at which Company maintains an account to provide Agent with such information with respect to such account as Agent from time to time reasonably may request, and Company hereby consents to such information being provided to Agent.

4.     **Rights With Respect To The Collateral**.

4.1     **No Duty on the Investors' Part**.  Neither Agent nor any Investor shall be required (except at their option upon the occurrence and during the continuation of any Event of Default) to realize upon any Accounts, Financial Assets, Instruments, Investment Property,

Chattel Paper or General Intangibles; collect the principal, interest or payment due thereon, exercise any rights or options of Company pertaining thereto; make presentment, demand or protest; give notice of protest, nonacceptance or nonpayment; or do any other thing for the protection, enforcement or collection of such Collateral. The powers conferred on Agent hereunder are solely to protect Agent's interests in the Collateral for the benefit of Agent, the Investors and shall not impose any duty upon Agent or any Investor to exercise any such powers. Except as otherwise agreed among Agent and the Investors, Agent shall be accountable only for amounts that Agent or the Investors actually receive as a result of the exercise of such powers; and neither Agent, any Investor or any of their officers, directors, employees or agents shall be responsible to Company for any act or failure to act hereunder.

4.2 **Negotiations with Account Holders**. Upon the occurrence and during the continuation of any Event of Default, Agent, at the direction of the Majority Holders, may extend or consent to the extension of the time of payment or maturity of any Instruments, Accounts, Chattel Paper or General Intangibles that are included in the collateral.

4.3 **Right to Assign**. Agent, at the direction of the Majority Holders, may transfer the whole or any part of the Secured Obligations and may transfer therewith as collateral security the whole or any part of the Collateral; and all obligations, rights, powers and privileges herein provided shall inure to the benefit of the assignee and shall bind the successors and assigns of the parties hereto.

4.4 **Duties Regarding Collateral**. Beyond the safe custody thereof, Agent shall not have any duty as to any Collateral in its possession or control, or as to any preservation of any rights of or against other parties.

4.5 **Collection From Account Debtors**. Upon the occurrence and during the continuation of any Event of Default, Company shall, upon demand by Agents (and without any grace or cure period), notify all Account Debtors to make payment to Agent of any amounts due or to become due. Company authorizes Agent to contact the Account Debtors for the purpose of having all or any of them pay their obligations directly to Agent, as appropriate. Upon demand by Agent, Company shall enforce collection of any indebtedness owed to it by Account Debtors.

4.6 **Inspection**. Agent and the Investors, from time to time at reasonable times and intervals, may inspect the Equipment and Inventory and inspect, audit and make copies of and extracts from all records and all other papers in the possession of Company.

5. **Investors' Rights And Remedies**.

5.1 **General**. Any material breach of this Agreement which is reasonably capable of being cured within 30 days of such breach but is not cured within such time shall constitute an Event of Default under this Agreement. Any Event of Default under the Notes shall constitute an Event of Default under this Agreement. Upon the occurrence of any such Event of Default, Agent at the direction of the Majority Holders may exercise the rights and remedies of

the Investors granted under the Purchase Agreement, the Notes, and under this Agreement and may exercise any other rights and remedies at law and in equity, including without limitation remedies available under the Uniform Commercial Code, simultaneously or consecutively, all of which rights and remedies shall be cumulative. The choice of one or more rights or remedies shall not be construed as a waiver or election barring other rights and remedies. Company hereby acknowledges and agrees that Agent is not required to exercise all rights and remedies available to them equally with respect to all the Collateral and that Agent may select less than all the Collateral with respect to which the rights and remedies as determined by Agent may be exercised.

        5.2    **Notice of Sale; Duty to Assemble Collateral**. In addition to or in conjunction with the rights and remedies referred to in Section 5.1 hereof:

        (a)    Written notice mailed to Company at the address designated herein ten days or more prior to the date of public or private sale of any of the Collateral shall constitute reasonable notice.

        (b)    If Agent requests, Company will assemble the Collateral and make it available to the Investors at places that the Investors shall reasonably select, whether on Company's premises or elsewhere.

        5.3    **Disposition of Collateral**. In addition to all rights and remedies provided in this Agreement or by law, if an Event of Default occurs, Agent may dispose of any of the Collateral at public auction or private sale in its then present condition or following such preparation and processing as Agent deem commercially reasonable. Agent has no duty to Company to prepare or process the Collateral prior to sale. Agent may disclaim warranties of title, possession, quiet enjoyment and the like. Such actions by Agent shall not affect the commercial reasonableness of the sale. Further, Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

        6.    **General Provisions**.

        6.1    **Entire Agreement**. This Agreement, together with the Purchase Agreement, the Notes and the other documents executed in connection herewith and therewith, sets forth all the promises, covenants, agreements, conditions and understandings between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied oral or written, with respect thereto, except as contained or referred to herein. This Agreement may be amended or terminated only by an instrument signed by Company and Agent, upon written approval of the Majority Holders. Any waiver of rights must be made in writing, as appropriate, by Agent upon written approval of the Majority Holders.

        6.2    **Invalidity**. If any provision of this Agreement shall for any reason be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision

hereunder, but this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

6.3 **Nonwaiver and Nonexclusive Rights and Remedies**.

(a) No right or remedy herein conferred upon or reserved to Agent is intended to be to the exclusion of any other right or remedy, but each and every such right or remedy shall be cumulative and shall be in addition to every other right or remedy given hereunder and now or hereafter existing at law or in equity.

(b) No delay or omission by Agent or any Investor in exercising any right or remedy accruing upon an Event of Default shall impair any such right or remedy, or shall be construed to be a waiver of any such Event of Default or an acquiescence therein, nor shall it affect any subsequent Event of Default of the same or of a different nature.

6.4 **Termination of Security Interest**. When all the Secured Obligations of a relevant party have been paid in full or converted into equity securities of Company, the security interest of the relevant party provided herein shall terminate and Agent , as appropriate, shall return to Company all Collateral then held by Agent , if any, and upon written request of Company, shall execute, in form for filing, termination statements of the security interests herein granted, in each case at the expense of Company. Thereafter, no party hereto shall have any further rights or obligations hereunder.

6.5 **Assignment**. Company may not assign this Agreement nor any of its rights, interests or obligations hereunder without the prior written consent of the Majority Holders; provided, that no such consent will be required in the event of: (a) the acquisition of all or substantially all the assets of Company or (b) the acquisition of Company by another corporation or entity by consolidation, merger or other reorganization in which the holders of Company's outstanding voting stock immediately prior to such transaction own, immediately after such transaction, securities representing less than 50 percent or more of the voting power of the corporation or other entity surviving such transaction. Except as otherwise provided herein, all rights of Agent and the Investors hereunder shall inure to the benefit of their respective successors and assigns, and all obligations of Company shall be binding upon its successors and assigns.

6.6 **Agent's Appointment as Attorney-in-Fact**.

(a) Company hereby irrevocably constitutes and appoints Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, which shall be deemed coupled with an interest and shall be irrevocable, with full power and authority in the place and stead of Company and in the name of Company or in its own name, from time to time in Agent's ' discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement, including, without limitation: (i) to demand, sue for, and give an effectual discharge of any sum

payable to Company for Collateral assigned to Agent ; (ii) to endorse in Agent's ' favor any negotiable instrument drawn in Company's favor in payment of the Collateral assigned to Agent ; (iii) to execute on behalf of Company any UCC financing statements, amendments thereto and continuations thereof (or similar statements of notice, registration, amendment or continuation under the laws of any jurisdiction), or other writing in connection with this Agreement or the Collateral as Agent may require for the purpose of protecting, maintaining or enforcing the Collateral or the security interest granted to Agent in the Collateral; (iv) to adjust, make, pursue, settle and collect any insurance claim in connection with this Agreement; and (e) to discharge taxes and encumbrances at any time levied or placed on the Collateral, except to the extent such as being contested by Company in good faith, or otherwise protect the Collateral, and to make repairs thereof. Company agrees to reimburse Agent on demand for any and all expenditures made in connection with any of the foregoing powers exercised by Agent hereunder.

(b)     Company hereby ratifies all that such attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(c)     Company also authorizes Agent, at any time and from time to time, to execute, in connection with the sale provided for in Article V hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(d)     The powers conferred on Agent hereunder are solely to protect Agent's and the Investors' interests in the Collateral and shall not impose any duty upon Agent, any Investor n to exercise any such powers. Agent and the Investors shall be accountable to Company only for amounts that they actually receive as a result of the exercise of such powers, and neither Agent, the Investors or any of their officers, directors, employees or agents, n shall be responsible to Company for any act or failure to act hereunder; provided, that Company is entitled to rely on directions to act and notice given by Agent as constituting directions to act or notice given directly from the Investors. By accepting the position as collateral agent, Agent represents to the Investors that Agent hereby agrees to act solely pursuant to directions given by the Majority Holders, except that Agent is authorized to take action without the direction of the Majority Holders if such action is deemed by it to be immediately necessary to: (i) avoid forfeiture of a right or remedy hereunder or (ii) to avoid loss or diminution of the value of the Collateral.

6.7     **Performance by the Investors of Company's Obligations**. If Company fails to perform or comply with any of its agreements contained herein and the Investors, as provided for by the terms of this Agreement, shall perform or comply, or otherwise cause performance or compliance, with such agreement, the expense of the Investors incurred in connection with such performance or compliance, together with interest thereon at the rate provided for in the Notes upon the occurrence of an Event of Default, shall be payable by Company to the Investors, in proportion to the principal amount of the Notes or such other basis as the Investors agree among themselves and Agent notifies Company, on demand and shall constitute Secured Obligations.

6.8 **Governing Law**. This Agreement and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with and shall be governed by the laws of the state of Washington, without regard to the choice of law rules thereof.

6.9 **Notices**. Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified, (c) one business day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten days' advance written notice to the other party given in the foregoing manner.

| | |
|---|---|
| If to Company: | OneName Corporation |
| | Attention:  Lon Wiese |
| | 21408 se 33rd place, |
| | Sammamish, Washington 98075 |
| | |
| With a copy to: | White & Lee LLP |
| | 805 SW Broadway, Suite 2440 |
| | Portland, OR 97205 |
| | Attention:  Wallace A. Glausi and |
| | Ernest G. Bootsma |
| | |
| | If to Agent: |
| | To such address as may be designated by the |
| | Agent to Company in writing. |
| | |
| If to Investors: | At the addresses shown on the signature pages to the Purchase Agreement or to such other address as an Investor may designate in writing to the other parties. |

6.10 **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall constitute an original Agreement, but all of which together shall constitute one and the same instrument.

6.11 **Dealings With Agent**. Notwithstanding anything in this Agreement to the contrary, Company shall  (a) be entitled to rely upon the right, power and authority of Agent to act for and on behalf of the Investors in exercising the rights vested in Agent under this Agreement; and (b) not be obligated to reimburse the Investors for costs incurred in exercising the Investors' rights and remedies under this Agreement or under the Notes, other than the costs and expenses of Agent (exclusive, however, of any such costs and expenses incurred by Agent in

dealing with disputes among the Investors as to the manner in which their rights are to be protected). Company shall be entitled for all purposes to rely upon such agency arrangement unless and until given written notice signed by the Majority Holders that Agent no longer has such power and authority.

**IN WITNESS WHEREOF**, Company has caused these presents to be duly executed by its duly authorized signatory as of the day and year first above written.

**ONENAME CORPORATION**
a Washington corporation


By:_____
     Vincent A. Caluori, CEO

# SCHEDULE I

## COPYRIGHTS

# SCHEDULE II

## PATENTS

**<u>SCHEDULE III</u>**

**TRADEMARKS**